**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CAROLE SAWYER, Individually and on
Behalf of All Others Similarly Situated,

　　　　　　　Plaintiff,

　　　v.

CARRIZO OIL & GAS, INC., STEVEN A.
WEBSTER, F. GARDNER PARKER,
SYLVESTER P. JOHNSON IV, ROBERT
F. FULTON, FRANCES ALDRICH
SEVILLA-SACASA, THOMAS L.
CARTER JR., and FRANK A. WOJTEK,

　　　　　　　Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  1:19-cv-08677

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND
20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Carole Sawyer ("Plaintiff"), by her undersigned attorneys, alleges upon personal

knowledge with respect to herself, and information and belief based upon, *inter alia*, the

investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.　　This action is brought as a class action by Plaintiff on behalf of herself and the other

public holders of the common stock of Carrizo Oil & Gas Inc. ("Carrizo" or the "Company")

against the Company and the members of the Company's board of directors (collectively, the

"Board" or "Individual Defendants" and, together with Carrizo, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17

C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between

Carrizo and Callon Petroleum Company ("Callon").

2.     On July 14, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 2.05 shares of Callon common stock for each share of Carrizo stock they own (the "Merger Consideration"). Upon completion of the merger, Carrizo shareholders will own approximately 46% and Callon shareholders will own approximately 54% of the combined company.

3.     On August 20, 2019, in order to convince Carrizo shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.     In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Carrizo shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Carrizo's financial advisors, RBC Capital Markets, LLC. ("RBC") and Lazard Frères & Co. LLC ("Lazard") in

support of their opinions that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Carrizo shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took place in this District. Additionally, Carrizo's common stock trades on the NASDAQ, which is headquartered in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a holder of Carrizo common stock.

12.      Defendant Carrizo is incorporated in Texas and maintains its principal executive offices at 500 Dallas Street, Suite 2300, Houston, Texas 77002.  The Company's common stock trades on the NASDAQ under the ticker symbol "CRZO."

13.      Individual Defendant Steven A. Webster is Carrizo's Chairman and has been a director of Carrizo since January 1993.

14.      Individual Defendant F. Gardner Parker is Carrizo's lead director and has been a director of Carrizo since January 2000.

15.      Individual Defendant Sylvester P. Johnson IV is Carrizo's President, Chief Executive Officer, and Co-Founder and has been a director of Carrizo since December 1993.

16.      Individual Defendant Robert F. Fulton has been a director of Carrizo since November 2012.

17.      Individual Defendant Frances Aldrich Sevilla-Sacasa has been a director of Carrizo since March 2018.

18.      Individual Defendant Thomas L. Carter Jr. has been a director of Carrizo since March 2005.

19.      Individual Defendant Frank A. Wojtek has been a director of Carrizo since January 1993.

20.     The Individual Defendants referred to in paragraphs 13-19 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public shareholders of Carrizo (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of August 9, 2019, there were approximately 93,000,000 shares of Carrizo common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Carrizo will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    The Proposed Transaction

23.    Carrizo is a Houston-based energy company that is engaged in the exploration, development, and production of crude oil, NGLs, and natural gas from resource plays located in the United States. The Company's current operations are focused in proved, producing oil and gas plays in the Eagle Ford Shale in South Texas and the Permian Basin in West Texas.

24.    On July 15, 2019, Carrizo and Callon issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> HOUSTON, July 15, 2019 /PRNewswire/ -- Callon Petroleum Company (NYSE: CPE) and Carrizo Oil & Gas, Inc. (Nasdaq: CRZO) today announced that their Boards of Directors have unanimously approved a definitive agreement under which Callon will acquire Carrizo in an all-stock transaction valued at $3.2 billion. This highly complementary combination will create a leading oil and gas company with scaled development operations across a portfolio of core oil-weighted assets in both the Permian Basin and Eagle Ford Shale.
>
> Under the terms of the agreement, Carrizo shareholders will receive a fixed exchange ratio of 2.05 Callon shares for each share of Carrizo common stock they own. This represents $13.12 per Carrizo share based on Callon's closing common stock price on July 12 and a premium of 18% to Carrizo's trailing 60-day volume weighted average price. Following the close of the transaction, Callon shareholders will own approximately 54% of the combined company, and Carrizo shareholders will own approximately 46%, on a fully diluted basis. The all-stock transaction is intended to be tax-free to Carrizo shareholders.
>
> "We are excited about this transformational transaction, creating a differentiated oil and gas company by integrating core asset bases in premier basins. Together with Carrizo, we will accelerate our free cash flow, capital efficiency and deleveraging goals through an optimized model of large-scale development across the portfolio. We will also benefit from leading cash margins to navigate commodity price volatility and allow for reliable, continuous development of the combined asset base. With a deep inventory of high rate-of-return well locations in well-established areas and substantial upside opportunities for organic inventory delineation, we will be able drive differentiated growth deploying our life-of-field development model for many years to come," said Joe Gatto, President and Chief Executive Officer of Callon. "As a larger organization, Callon will be well-positioned to benefit from an expanded infrastructure footprint and critical mass for our production marketing and supply chain functions and also leverage our technology and data capture

initiatives across a broader base. Importantly, this combination brings together two organizations grounded in strong values and a shared commitment to responsible operations, integrity, and a drive to deliver leading results. We look forward to welcoming Carrizo's employees and joining forces as a Houston-based company focused on the development of a premier Texas asset base to create enhanced value for all of our stakeholders."

S.P. "Chip" Johnson, IV, President and Chief Executive Officer of Carrizo, commented, "We believe that Callon is the ideal partner for Carrizo. Through our combination, we bring together a strong foundation of Midland Basin and Eagle Ford Shale assets and overlay a substantial Delaware acreage position and value proposition that will be unlocked through an integrated plan of large-scale program development. This all-stock transaction provides Carrizo shareholders with the opportunity to participate in the significant near- and long-term upside potential of the merged company. We look forward to a bright future for our employees and all of our stakeholders and expect a seamless integration."

**Strategic and Financial Benefits of the Transaction**

- **Increases Corporate and Delaware Basin Scale:** On a pro forma basis, Callon will have an approximate 200,000 net acre footprint in the Permian Basin and Eagle Ford Shale, including over 90,000 net acres in the Delaware Basin, and approximately 2,500 total gross horizontal drilling locations. The companies produced a combined 102.3 MBoe/d in 1Q19 (71% oil) and generated pro forma LTM 1Q19 adjusted EBITDAX of $1.2 billion. With an expected total of 9 to 10 drilling rigs and 3 to 4 completion crews working during the course of 2020, predominantly in the Permian Basin, the combined entity will have the critical mass to realize supply chain savings and sustain simultaneous operations initiatives.

- **Expands Portfolio of Complementary High-Quality Assets:** Together with Carrizo, Callon will be a premier Texas operator with an extensive inventory of core Permian and Eagle Ford locations that compete for capital on a full-cycle basis. As a portfolio, our increased level of large project initiatives in the Permian Basin will be balanced by sustained investment in shorter cycle and less capital-intensive projects in the Eagle Ford Shale. Based on initial plans for capital allocation within the combined portfolio, Callon forecasts its free cash flow breakeven WTI crude oil price to progress to under $50/Bbl by 2021.

- **Accelerates Free Cash Flow Generation:** Callon expects this combination to be immediately accretive to free cash flow per share in 2020 with positive free cash flow generation of over $100 million at current strip pricing[1] while maintaining double-digit production growth. The combination brings together a well-established and repeatable free cash flow generating business in the Eagle Ford Shale with Permian Basin assets that are rapidly transitioning to positive net cash flows with increasing investment in high-return projects. In addition, the combined company's corporate free cash flow will be increased through an optimized

development plan in addition to corporate cost savings. This sustained free cash flow generation will accelerate Callon's deleveraging initiatives and improve its capacity to return capital to shareholders in the future.

- **Maintains Callon's Financial Strength and Flexibility:** Callon expects to have an enhanced credit profile due to broader scale and scope, and a substantial base of oil-weighted proved developed producing reserves. Importantly, significant free cash flow generation will drive the combined company's leverage ratio to below 2.0x in 2020 at current strip pricing. Additionally, upon closing, the combined company is anticipated to have pro forma liquidity of more than $1 billion under a new underwritten credit facility combined with no near-term debt maturities.

- **Drives Substantial Identified Synergies:** The combination is expected to generate a total of $850 million in net present value from the following categories of primary synergies:
  - Annual run-rate operational synergies of $65 to $80 million attributed to a structural shift in the combined program development model, consisting of:
    - Expanded large scale development in the Permian Basin, deploying simultaneous drilling and completion operations, improving production cycle times and reducing well costs;
    - Optimized, integrated development schedule to capture efficiencies from continuous utilization of dedicated completion crews; and
    - Improved uptime from concentrated development, resulting in reduced production downtime from offsetting completion operations.
  - Estimated annual cash general and administrative savings of $35 million to $45 million.
  - Optimized capital allocation initiatives, including a mix of shorter and longer cycle projects, select activity acceleration within a larger cash flow base and high-grading of drilling inventories.

In addition, Callon has identified further synergies that are anticipated to be realized over time:

  - Integration of Delaware infrastructure and water management, expanding the opportunity for water recycling programs and increasing scale for potential monetization structures;
  - Larger portfolio of non-core acreage for divestment and trades, high-grading overall returns on capital;
  - Increased hydrocarbon volumes provide critical mass for marketing arrangements and ongoing initiatives to control critical parts of the value chain, including firm transportation on pipelines; and
  - Cost of capital reductions, including opportunistic debt refinancings.

**Governance and Leadership**

The transaction has been unanimously approved by the Boards of Directors at both Callon and Carrizo. In addition, each of the Carrizo directors has committed to vote his or her shares in favor of the transaction.

Upon closing, the Board of Directors of the combined company will consist of 11 members, including Callon's eight current Board members and three to be appointed from the Board of Carrizo. The combined company will be led by Callon's executive management team and will remain headquartered in Houston, Texas.

**Timing and Approvals**

The transaction, which is expected to close during the fourth quarter of 2019, is subject to customary closing conditions and regulatory approvals, including the approval of shareholders of both companies.

**Second Quarter Updates**

For the second quarter of 2019, Callon expects daily production of between 40.0 and 40.5 MBoed with approximately 77% coming from oil. Total capital expenditures, inclusive of capitalized expenses and on an accrual basis, is expected to be between $162.5 and $167.5 million with operational capital representing approximately $132.5 to $137.5 million of that estimate. Lease operating expense for the second quarter is expected to be between $6.30 and $6.50 per Boe.

For the second quarter of the year, Carrizo expects crude oil production to be approximately 44,400 Bbls/d, exceeding the high-end of the Company's guidance range. Total production is expected to be approximately 65,600 Boe/d. This is below the low-end of the Company's guidance range for the quarter of 66,500-67,500 Boe/d as its production during June was materially impacted by weather-related downtime at a third-party gas processing plant in the Delaware Basin. In total, third-party midstream issues negatively impacted the Company's production by more than 4,000 Boe/d during the second quarter. Carrizo currently expects drilling, completion, and infrastructure (DC&I) capital expenditures to be $130-$135 million in the second quarter and expects to meet or beat its second quarter guidance ranges for expense items.

**Advisors**

J.P. Morgan LLC is serving as exclusive financial advisor to Callon and Kirkland & Ellis LLP is serving as legal advisor to Callon. JPMorgan Chase Bank, N.A. and BofA Merrill Lynch provided underwritten financing to Callon to support the transaction. RBC Capital Markets, LLC and Lazard are serving as financial advisors to Carrizo and Baker Botts L.L.P. is serving as legal advisor to Carrizo.

**Conference Call and Webcast**

The companies will host a joint conference call and webcast today at 8:30 a.m. ET / 7:30 a.m. CT to discuss the transaction.

The conference call can be accessed by dialing (800) 374-1355 within the United States and (270) 855-8553 for all other locations. The confirmation code is 2381448. Participants should dial in 10 minutes prior to the scheduled start time.

A live webcast of the conference call and associated presentation materials will be available in the investor relations section of each company's website at ir.callon.com and https://ir.carrizo.com/investor-relations/default.aspx.

A replay of the conference call will be available approximately two hours after completion of the conference call through July 29, 2019 and can be accessed by dialing (800) 585-8367 from the United States or (404) 537-3406 from outside the United States. The replay confirmation code is 2381448. The webcast will be archived in the investor relations section of each company's website.

**About Callon**

Callon is an independent energy company focused on the acquisition and development of unconventional onshore oil and natural gas reserves in the Permian Basin in West Texas.

This news release is posted on Callon's website at www.callon.com, and will be archived for subsequent review under the "News" link on the top of the homepage.

**About Carrizo**

Carrizo Oil & Gas, Inc. is a Houston-based energy company actively engaged in the exploration, development, and production of oil and gas from resource plays located in the United States. Our current operations are principally focused on proven, producing oil and gas plays in the Eagle Ford Shale in South Texas and the Permian Basin in West Texas.

25.     Carrizo is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

26.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading S-4

27.     On August 20, 2019, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

28.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses "in connection with its evaluation of the merger, Carrizo's management prepared certain unaudited internal financial and operating forecasts and estimates (i) with respect to Carrizo, which were provided to the Carrizo board and Callon, as well as Carrizo's and Callon's respective financial advisors, in connection with their evaluation of the proposed merger, and (ii) with respect to Callon (including estimates for expected cost savings and other synergies), which were provided to the Carrizo board, as well as Carrizo's financial advisors, in connection with their evaluation of the proposed merger."  S-4 97.

29.     The S-4 includes multiple sets of projections for Carrizo and Callon (as prepared by Carrizo's management). With respect to Carrizo, the S-4 contains two sets of projections for Carrizo's financial and operating forecasts prepared on a risked basis: one based on the NYMEX oil and natural gas strip pricing for 2019 through 2023 and one based on Wall Street consensus pricing from 2019 through 2020. *Id.* at 99. The S-4 also contains three sets of projections for Carrizo's financial and operating forecasts for operated assets using three additional pricing assumptions: (1) strip pricing for the years 2019 through 2023; (2) strip pricing for each of 2019 and 2020 and $45.00/Bbl for crude oil and $2.75/Mcf for natural gas thereafter; and (3) strip pricing for each of 2019 and 2020, and $60.00/Bbl for crude oil and $2.75/Mcf for natural gas thereafter. *Id.* at 99-100.

30.     With respect to Callon's financial projections as prepared by Carrizo's management, the S-4 contains two sets of projections for Callon's financial and operating forecasts prepared on a risked basis and two sets of financial and operating forecasts based on additional pricing assumptions. *Id.* at 101. One of the risked basis projections is based on the NYMEX oil and natural gas strip pricing for 2019 through 2023 and the other is based on Wall Street consensus pricing from 2019 through 2020. *Id.* One of the additional pricing assumption projections is based on strip pricing for each of 2019 and 2020, and $45.00/Bbl for crude oil and $2.75/Mcf for natural gas thereafter, and the other is based on strip pricing for each of 2019 and 2020, and $60.00/Bbl for crude oil and $2.75/Mcf for natural gas thereafter. *Id.*

31.     The S-4 discloses synergies and cost savings that are expected to be realized from the consummation of the Proposed Transaction. *Id.* at 103. The S-4 describes, but does not disclose, certain estimates that were provided to the Board, RBC, and Lazard, including: (i) certain one-time costs as a result of the proposed merger consisting of severance costs and financial, legal

and other advisory fees; and (ii) the present value tax effect of the expected synergies and cost savings, transaction costs and restricted usage of certain of Carrizo net operating losses due to limitations expected to be imposed by Section 382 of the Code as a result of a merger with Callon. *Id.*

32.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

33.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

34.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial*

*results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

35.     Here, Carrizo's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine that "[t]he Carrizo board determined that entering into the merger agreement with Callon was preferable to continuing to operate on a stand-alone basis in light of certain risks associated with continuing to operate as a stand-alone company[.]" S-4 90.

36.     As discussed further below, the non-GAAP financial projections used do not provide Carrizo's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

37.     The S-4 discloses "in connection with its evaluation of the merger, Carrizo's management prepared certain unaudited internal financial and operating forecasts and estimates (i) with respect to Carrizo, which were provided to the Carrizo board and Callon, as well as Carrizo's and Callon's respective financial advisors, in connection with their evaluation of the proposed merger, and (ii) with respect to Callon (including estimates for expected cost savings and

other synergies), which were provided to the Carrizo board, as well as Carrizo's financial advisors, in connection with their evaluation of the proposed merger." *Id.* at 97.

38.     The S-4 goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023, for both Carrizo and Callon, for Adjusted EBITDA but fails to provide: (i) the line items used to calculate the non-GAAP metric; nor (ii) a reconciliation of the non-GAAP projections to the most comparable GAAP measures. *Id.* at 99-100.

39.     The S-4 defines Adjusted EBITDA as "total revenues less lease operating expenses, production and ad valorem taxes, cash general and administrative expense plus net cash received (less net cash paid) for commodity derivative settlements." *Id.* at 99 n.1.  Adjusted EBITDA is defined the same for both the Carrizo and Callon projections as prepared by Carrizo's management. Nevertheless, the S-4 fails to disclose the line items used to calculate Adjusted EBITDA, rendering the use of Adjusted EBITDA in the S-4 materially false and/or misleading. *Id.*

40.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.     The non-GAAP financial projections disclosed on page 99-100 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those

non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, and as a result, shareholders are unable to discern the veracity of the financial projections.

42.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

43.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

44.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

"this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Carrizo included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

46.    The SEC has required compliance with Regulation G, including reconciliation

---

[4]      SEC, *Final Rule.*

[5]      *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]      Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

47.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

---

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

***The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9***

48.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above. Indeed, Defendants acknowledge that "Adjusted EBITDA is a non-GAAP financial measure as it excludes certain items that are included in net income (loss) attributable to common shareholders, the most directly comparable GAAP financial measure. Adjusted EBITDA should not be considered as a substitute for net income (loss) attributable to common shareholders, net cash provided by operating activities, or any other measure of profitability or liquidity presented in accordance with GAAP."  S-4 99 n.1.

50.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

51.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 99-100, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

***The Materially Misleading Financial Analyses***

52.     The summary of the valuation methodologies utilized by RBC and Lazard, including the utilization of certain of the non-GAAP financial projections described above by RBC and Lazard, in connection with their valuation analyses (*id.* at 113, 123), is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the

valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

53. RBC performed a Net Value Analysis on both Carrizo and Callon. With respect to RBC's *Net Asset Value Analyses* of Carrizo, RBC calculated the estimated net present value of its estimated oil and gas resources as based on the Carrizo reserve information provided by management. *Id.* at 115-116. RBC performed the analysis using a reserve adjustment factor approach, as provided by Carrizo's management, and RBC used both Carrizo's strip pricing projections and the additional pricing projections of $45 and $60 flat pricing. *Id.* at 116. Carrizo's management applied discount ranges to Carrizo's reserve information as follows: (a) 100% for Proved Developed Producing Reserves; (b) 95% for Proved Developed Non-Producing Reserves; and (c) 90% for Undeveloped Resources, as well as discounts to reflect estimated well production downtimes. *Id.* RBC applied discount rates of 9.5% to 11.5% to the projected cash flows reflecting the Company's weighted average cost of capital. *Id.* RBC derived implied equity value per share reference ranges by adjusting the reserve value reference ranges for capital costs, estimated taxes after taking into account the Company's tax attributes, general and administrative expenses, the Company's net debt, and certain balance sheet adjustments primarily related to working capital, hedges, and acquisition and divestiture related contingent payments, all as provided by the Company's management, and dividing by the diluted shares outstanding. *Id.*

54. With respect to RBC's *Net Asset Value Analyses* of Callon, RBC calculated the estimated net present value of Callon's estimated oil and gas resources as based on Callon's reserve information. *Id.* at 117. RBC performed the analysis using a reserve adjustment factor approach, as provided by Carrizo's management, and RBC used both Callon's strip pricing projections and

the additional pricing projections of $45 and $60 flat pricing.  *Id.*  Carrizo's management applied discount ranges to Callon's reserve information as follows: (a) 100% for Proved Developed Producing Reserves; (b) 95% for Proved Developed Non-Producing Reserves; and (c) 90% for Undeveloped Resources, as well as discounts to reflect estimated well production downtimes.  *Id.* RBC applied discount rates of 9.0% to 11.0% to the projected cash flows reflecting Callon's weighted average cost of capital.  *Id.*  RBC derived implied equity value per share reference ranges by adjusting the reserve value reference ranges for capital costs, estimated taxes after taking into account the Callon's tax attributes, general and administrative expenses, Callon's net debt, and certain balance sheet adjustments primarily related to working capital, hedges, and acquisition and divestiture related contingent payments, all as provided by the Company's management, and dividing by the diluted shares outstanding.  *Id.* at 117-18.

55.    The S-4 does not disclose any of the inputs that went into calculating the weighted average cost of capital, the adjustments made for capital costs, estimated taxes, general and administrative expenses, the net debt, the balance sheet adjustments nor the diluted shares outstanding for either Carrizo or Callon.

56.    This information is necessary because the different pricing scenarios paint a very different picture of the Merger Consideration.  In two of the three pricing scenarios, the Merger Consideration is on the low end.  If the additional pricing projection whereby $60 flat pricing occurs, the implied exchange ratio reference range would be 1.790 – 3.146x as compared to the exchange ratio of 2.05x.  *Id.* at 119.  If the strip pricing scenario was realized, then the implied exchange ratio reference range would be 1.633x – 3.184x as compared to the exchange ratio of 2.05x.  *Id.*  The only scenario where the Merger Consideration is in the middle of the range is the additional pricing projection whereby $45 flat pricing occurs, making the implied exchange ratio

reference rage 0.660x – 3.008x.  *Id.*  Therefore, in order for shareholders to truly understand the value of their shares as compared to the Merger Consideration, the omitted information must be disclosed.  Without it, shareholders will not be able to adequately determine the fair value of their shares are being materially mislead about the Merger Consideration.

57.    Lazard also performed a NAV analysis on the Company and Callon. *Id.* at 125. With respect to Lazard's *Net Asset Value Analysis* of Carrizo, Lazard calculated the estimated net present value of the unlevered free cash flows that Carrizo was projected to generate for fiscal year 2019 through fiscal year 2023 from its risked reserves and undeveloped resources, based on the estimates reflected in the forecasts provided by Carrizo management, using both Carrizo's strip pricing projections and the additional pricing projections of $45 and $60 flat pricing.  *Id.*  Lazard used a reserve adjustment factor approach and applied a discount rate rage of 8.6% to 11.8% based on the Company's weighted average cost of capital.  *Id.*  Lazard calculated the equity NAV of Carrizo as the net present value of the unlevered free cash flows less the present value of non-drilling and completion capital expenditures and corporate adjustments (including federal and state taxes, general and administrative expenses, changes in net working capital, hedging expenses, and certain balance sheet items), in each case as estimated by Carrizo management.  *Id.*

58.    With respect to Lazard's *Net Asset Value Analysis* of Callon, Lazard calculated the estimated net present value of the unlevered free cash flows that Callon was projected to generate for fiscal year 2019 through fiscal year 2023 (after giving effect to the Southern Midland Ranger divestiture that was completed on June 12, 2019 and the Callon preferred stock redemption that was completed on July 18, 2019) from its risked reserves and undeveloped resources, based on the estimates reflected in the forecasts provided by Carrizo management, using both Callon's strip pricing projections and the additional pricing projections of $45 and $60 flat pricing.  *Id.* at 126.

Lazard used a reserve adjustment factor approach and applied a discount rate rage of 7.6% to 12.2% based on Callon's weighted average cost of capital. *Id.* Lazard calculated the equity NAV of Callon as the net present value of pre-tax cash flows generated by Callon's risked reserves and undeveloped resources, less the present value of non-drilling and completion capital expenditures and corporate adjustments (including federal and state taxes, general and administrative expenses, changes in net working capital, hedging expenses, and certain balance sheet items), in each case as estimated by Carrizo management. *Id.*

59.     The S-4 does not disclose any of the inputs that went into calculating the weighted average cost of capital, the adjustments made for capital expenditures and corporate adjustments, estimated taxes, general and administrative expenses, changes in net working capital, hedging expenses nor certain balance sheet items for either Carrizo or Callon.

60.     Moreover, it is not clear that Lazard calculated the cash flows the same way for Carrizo and Callon. Lazard calculated Carrizo's equity NAV as "the net present value of the unlevered free cash flows less . . . ." *Id.* at 125.  However, Lazard calculated Callon's equity NAV as "the net present value of pre-tax cash flows generated by Callon[] . . . ." *Id.* at 126.  The S-4 needs to disclose if the cash flows were calculated using the same method and disclose the calculated values.

61.     This information is necessary because the different pricing scenarios paint a very different picture of the Merger Consideration. In all of the pricing scenarios, the Merger Consideration is on the low end.  If the additional pricing projection whereby $60 flat pricing occurs, the implied exchange ratio reference range would be 1.4x – 4.3x as compared to the exchange ratio of 2.05x.  *Id.* at 129.  If the strip pricing scenario was realized, then the implied exchange ratio reference range would be 1.2x – 4.6x as compared to the Merger Consideration of

2.05x. *Id.* If the additional pricing projection whereby $45 flat pricing occurs, the implied exchange ratio reference range would be 0.4x – 6.3x as compared to the Merger Consideration of 2.05x. *Id.* Therefore, in order for shareholders to truly understand the value of their shares as compared to the Merger Consideration, the omitted information must be disclosed. Without it, shareholders will not be able to adequately determine the fair value of their shares and are being materially mislead about the Merger Consideration.

62.    RBC performed a Discounted Cash Flow ("DCF") analysis on both Carrizo and Callon. With respect to RBC's *Discounted Cash Flow Analysis* of Carrizo, the S-4 states that RBC performed a discounted cash flow analysis of Carrizo by calculating the estimated net present value of the after-tax free cash flows of Carrizo based on the Carrizo projections using the strip pricing assumption. *Id.* at 116. RBC used a discount rate ranging from 9.5% to 11.5% based on the Company's weighted average cost of capital and a size premium, and calculated a range of terminal values by applying terminal multiples ranging from 3.0x to 4x estimated calendar year 2023 Adjusted EBITDA as provided in the Company's projections. *Id.* RBC then deducted net debt and divided by the diluted outstanding shares to derive the equity values. *Id.*

63.    With respect to RBC's *Discounted Cash Flow Analysis* of Callon, the S-4 states that RBC performed a discounted cash flow analysis of Callon by calculating the estimated net present value of the after-tax free cash flows of Callon based on the Callon projections using the strip pricing assumption. *Id.* at 118. RBC used a discount rate ranging from 9.0% to 11.0% based on Callon's weighted average cost of capital and a size premium, and calculated a range of terminal values by applying terminal multiples ranging from 3.75x to 4.75x estimated calendar year 2023 Adjusted EBITDA as provided in Callon's projections. *Id.* RBC then deducted net debt and divided by the diluted outstanding shares to derive the equity values. *Id.*

64.    The S-4 does not disclose UFCF values, the calculated range of terminal values, any of the inputs that went into calculating the weighted average cost of capital, the inputs and assumptions that went into the selection of the terminal multiple range, how stock-based compensation was treated, nor the net debt nor the fully diluted shares outstanding for either company.

65.    Since information was omitted, shareholders are unable to discern the veracity of RBC's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare RBC's calculations with the Company's financial projections.  The absence of any single piece of the above information renders RBC's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

66.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . " *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

67.    Therefore, in order for Carrizo shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

68.    In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from Carrizo shareholders.

69.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

70.    Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
17 C.F.R. § 244.100 Promulgated Thereunder)**

71.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

72.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

73.    As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

74.    The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

75.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

76.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

78.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

79.    Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

80.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

81.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

82.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

83.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

84.    Carrizo is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

85.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

86.    As a direct and proximate result of the dissemination of the false and/or misleading

S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

**COUNT III**

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Carrizo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Carrizo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

89.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

91.     In addition, as the S-4 sets forth at length, and as described herein, that the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

92.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

93.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been

omitted from the S-4;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 18, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr._
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Carole Sawyer ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Carrizo Oil & Gas, Inc. (Carrizo) and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Carrizo's securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 11th day of September, 2019.

Carole Sawyer

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 10/05/17 | 200 |
|  |  |  |
|  |  |  |